UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RAYMOND HAWKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:21-cv-01465-JMS-MKK |
| | ) |
| LT. STORMS, | ) |
| R. SCHILLING, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Raymond Hawkins—an Indiana Department of Correction ("IDOC") inmate—brings this civil action under 42 U.S.C. § 1983 based on events that occurred during September and October 2020. He alleges that Defendant Lieutenant Storms violated the Eighth Amendment by refusing to move him to a different range when inmates housed near him tested positive for COVID-19. Dkt. 14 (Original Screening Order). He also alleges that Defendant Rachel Schilling violated the Eighth Amendment by failing to ensure he received medical attention after he became ill and suffered from COVID-19-like symptoms. Dkt. 23 (Order Screening Amended Complaint). Both Defendants have moved for summary judgment. Dkts. 80, 84. For the reasons stated below, those motions are **granted**.

**I.
Legal Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable

to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). That said, speculation is insufficient to survive summary judgment. *Id.* at 573.

The court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). In addition, a court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Hawkins and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

At all relevant times, Mr. Hawkins was incarcerated at New Castle Correctional Facility ("New Castle"). Dkt. 91-1 at 2.

Defendant Lieutenant Storms was a correctional officer at New Castle. Dkt. 85-2 at 1.

Defendant Rachel Schilling was the Health Services Administrator ("HSA") at New Castle. Dkt. 82-2 at 1. HSA Schilling is not a medical professional and does not have the legal authority to diagnose patients or order specific treatment. *Id.* Her job duties and responsibilities were primarily administrative in nature, and she rarely was involved in direct patient care or contact. *Id.* Instead, she oversaw the provision of medical services at the facility, ensured compliance with IDOC Health Services Directives, served as a liaison between IDOC and medical staff, and also responded to requests for information and grievances on behalf of the medical department. *Id.*

### B. IDOC Policies

In March 2020, the IDOC published a Preparedness and Response Plan for managing infectious diseases. Dkt. 82-3. The plan required each IDOC facility to develop procedures for managing infectious diseases, including "[s]eparation of ill offenders," "[i]mplementing social distancing when a few offenders are ill," and "[i]solation housing units when a substantial number of offenders are ill." *Id.* at 4. "Social distancing" is defined as "[m]easures that limit contact between people (reducing personal interactions)." *Id.* at 3.

The plan states that, during an infectious disease outbreak, "[a]ny facility staff with direct offender contact shall refer any offender exhibiting [symptoms associated with infectious disease] to the Health Services Unit." *Id.* at 8. In addition, Health Service Administrators ("HSA") "shall arrange for the immediate evaluation and treatment of any offender with symptoms," and nursing

3

staff screening and triaging health care request forms "shall immediately assess any offender who submits a health care request form noting any of these symptoms." *Id.*

Under a separate policy, when inmates housed in the restricted housing unit ("RHU") submit health care request forms, medical staff is required to schedule the inmate to be triaged within 24 hours. Dkt. 1-1 at 18. If there is a referral to a medical provider, the policy states that the inmate shall be seen within seven days. *Id.*

### C.  Request for Cell Change

In September 2020, Mr. Hawkins was housed in the RHU at New Castle. Dkt. 93-1 at 3. Inmates in that unit were assigned to single-man cells and subject to additional restrictions on their access to property and movement through the facility. Dkt. 82-2 ¶ 7. The cell doors had open spaces on the sides and bottoms, as well as food slots that were opened at least three times per day. Dkt. 85-2 at 5. Inmates were able to speak to each other through the open spaces on their doors and through the vents in their cells. *Id.* at 14. The showers and recreation rooms in the RHU also had open bars on their doors. *Id.* at 5. The doors on the recreation rooms were about four feet apart, and the doors on the showers were less than two feet apart. Dkt. 94 at 9. Inmates did not generally wear masks while sleeping, showering, or participating in recreation. *Id.* at 8–9.

During the period around September 3 to 5, 2020, Mr. Hawkins asked Lieutenant Storms multiple times to move him to another range because inmates who had tested positive for COVID-19[1] had been placed in cells around him. Dkt. 93-1 at 3. At the time, Mr. Hawkins's cell was less than three feet away from several other inmates who had tested positive for COVID-19 and less

---

[1] It is not clear to the Court that the record includes admissible evidence directly showing that the other inmates had, in fact, tested positive for COVID-19. Neither side has submitted medical records showing such test results, and Mr. Hawkins's testimony about the positive test results must necessarily be based on information he got from other sources and is, thus, inadmissible hearsay. Nonetheless, given the timing of the events at issue in this case, the Court will assume that a reasonable jury could infer that the other inmates were infected with COVID-19 given the fact that they were coughing.

than six feet away from still other COVID-19-positive inmates. Dkt. 94 at 8. He also showered next to inmates who had tested positive for COVID-19. *Id.* at 10. The inmates in proximity to him were coughing and talking. *Id.* at 8.

Lieutenant Storms had the authority to move Mr. Hawkins but did not do so. Dkt. 85-2 at 10, 13. The last time Mr. Hawkins asked to move, Lieutenant Storms responded by saying, "I don't care if you catch COVID-19. I hope you do. I'm not moving you anywhere so stop asking me." Dkt. 93-1 at 3. Although Lieutenant Storms did not move Mr. Hawkins, he separated the COVID-19-positive inmates in their own cells and added necessary sanitation procedures. Dkt. 85-2 at 13. At the time, Lieutenant Storms was aware that the CDC recommended wearing masks to prevent the spread of the COVID-19 virus. *Id.* at 15.

At some point in the next few days, Mr. Hawkins became sick with symptoms consistent with COVID-19. Dkt. 93-1 at 4.

### D. Medical Attention

On September 8, 2020, Mr. Hawkins told a medic in his range that he was feeling sick and that he had had unusual body pain for the past couple of days. *Id.* at 4. On September 9, he submitted a healthcare request form to a nurse on his range titled, "Emergency/Need of COVID-19 test" and explaining that he had been exposed to COVID-19-positive inmates and was "feeling under the weather (sick)." Dkt. 82-1 at 1. He also asked for a COVID-19 test as soon as possible. *Id.* For reasons not evident from the record, the health care request form was not received by medical staff until September 25, 2020. Dkt. 82-2 at 2. Mr. Hawkins has not designated any evidence suggesting that HSA Schilling was responsible for the delay or knew that he was experiencing COVID-19-like symptoms during that period.

On September 19, 2020, Mr. Hawkins submitted another health care request form stating that he had been exposed to inmates who had tested positive for COVID-19 and had been "feeling sick for a week." Dkt. 82-1 at 2. Again, he asked for a COVID-19 test as soon as possible. *Id.*

On September 30, 2020, Mr. Hawkins submitted a "Request for Interview" form to HSA Schilling. Dkt. 91-1 at 35–36. He explained that he had submitted health care request forms on September 9 and 19 requesting care and COVID-19 tests but had not heard back from medical staff. *Id.* He stated that he had been exposed to multiple inmates who had tested positive for COVID-19, had been "feeling real sick," was "experiencing pain and COVID-19 like symptoms that's getting worse and worse as the days go by," and would like to have someone from the medical department help him and "check [his] vitals or something." *Id.*

On October 5, 2020, Mr. Hawkins received responses to his first two health care request forms. Dkt. 82-1 at 1–2. The signature of the responding person is illegible, but the responses to both say that COVID-19 testing is not done by request. *Id.* Mr. Hawkins disputes that COVID-19 testing was not done by request because he was tested after making a request in June 2020. Dkt. 92 at 6.

On October 5, 2020, HSA Schilling responded to Mr. Hawkins's request for interview form stating, "See response and orders given by HSA concerning your two request for health care forms dated 9/9/20–9/19/20." Dkt. 82-1 at 3. At the time, HSA Schilling understood that there was no standard treatment for COVID-19. Dkt. 82-2 at 3. Instead, she understood that patients were often encouraged to increase their fluid intake and rest, with medications such as Tylenol being provided to address complaints of pain and to lower fever. *Id.*

On October 6, 2020, Mr. Hawkins was seen by a medical provider for a chronic care visit, which would have been scheduled even if he had not submitted health care request forms

6

complaining of COVID-19 symptoms. Dkt. 82-1 at 4–7. The provider's treatment note indicates that Mr. Hawkins had chills, night sweats, a cough, dizziness, and a headache but that he had no fever. *Id.* at 5. The provider ordered a COVID-19 test, directed a nurse to obtain Mr. Hawkins's vital signs, and directed Mr. Hawkins to drink at least 2 liters of fluids daily and start taking Tylenol. *Id.* at 6. At his deposition, Mr. Hawkins acknowledged that, at this time, he had access to commissary, although he did not try to buy Tylenol because a medical provider had not told him to take Tylenol. Dkt. 82-4 at 4–5, pp. 13–14; *id.* at 13–14, pp. 47–48. He also testified that, at the time, he believed he was consuming adequate fluids because he tries to drink a lot of water. *Id.* at 11, p. 39.

## III.
## Discussion

### A. HSA Schilling

Mr. Hawkins contends that HSA Schilling was deliberately indifferent to his serious medical needs when she failed to get him medical attention after he complained that he had been exposed to COVID-19-positive inmates and was ill. The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 888–89 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

HSA Schilling does not dispute that Mr. Hawkins's COVID-19-like illness constituted an objectively serious medical condition. Instead, she contends that she is entitled to summary judgment because she was not personally involved in any constitutional violation and, even if she was, she was not deliberately indifferent to Mr. Hawkins's serious medical needs, and there is no evidence that any delay in seeing a medical professional caused him any harm. *See generally* dkt. 81. As to the first point, the Court will assume that a reasonable jury could infer based on HSA Schilling's title and job responsibilities that, even if she could not provide medical care herself, she could have intervened with medical staff to ensure that Mr. Hawkins was seen more quickly, thereby arguably contributing to any delay in him receiving care. The Court, however, agrees that no designated record evidence would allow a reasonable jury to conclude that HSA Schilling was deliberately indifferent to Mr. Hawkins's serious medical needs or that the delay in seeing a medical professional caused him any harm.

1. **Deliberate Indifference**

For Mr. Hawkins to avoid summary judgment, the record must allow a reasonable jury to conclude that HSA Schilling acted with deliberate indifference—that is, that she "consciously disregarded a serious risk to [Mr. Hawkins's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Hawkins "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*.

Mr. Hawkins's delayed medical care claim against HSA Schilling is based on the one-week delay between when he sent her a request for interview form on September 30, 2020, and his appointment with a medical care provider on October 6, 2020.[2] As HSA Schilling argues, Mr.

---

[2] To the extent that Mr. Hawkins seeks to hold HSA Schilling for the period between his first health care request form on September 9, 2020, and his request for interview on September 30, 2020, the

8

Hawkins did not even contact her until September 30, 2020, and there is no designated evidence suggesting that she knew about Mr. Hawkins's symptoms before October 5, 2020, when she responded to the request for interview form he had sent her.

At that time, HSA Schilling understood that there was no treatment for COVID-19 beyond increasing fluids and taking Tylenol, which is an over-the-counter medication. Mr. Hawkins's health care request forms and request for interview form included no information suggesting that he was suffering from symptoms that were serious enough to require immediate or expedited medical attention—such as shortness of breath or an inability to eat or drink—or even symptoms that could not be alleviated by increased fluids and Tylenol, both of which were available to Mr. Hawkins without seeing a medical provider.[3] Instead, he stated generally that he was feeling "sick" and experiencing "pain" and "COVID-like symptoms." *See* 82-1 at 1–2; dkt. 91-1 at 35–36. *Compare Kipp v. Wexford of Ind., LLC*, No. 2:21-cv-00124-JPH-DLP, 2022 WL 4599140, at *4 (S.D. Ind. Sept. 30, 2022) (denying summary judgment where plaintiff complained that he could not get out bed or eat because need for care was obvious). That is, the undisputed designated

---

unexplained delay in his first health care request form making it to the medical department is concerning, as is the fact that no one responded to his September 19 health care request form for more than two weeks. But HSA Schilling is not vicariously liable for the unconstitutional actions of other members of New Castle's medical staff, and no record evidence supports an inference that HSA Schilling knew about Mr. Hawkins's health care request forms or symptoms before September 30. Thus, she cannot be responsible for that any delay before that date. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* . . . , a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

[3] As explained, at his deposition, Mr. Hawkins admitted he had access to commissary but testified that he did not try to buy Tylenol because no medical provider had instructed him to do so. There is, however, no evidence that would allow a reasonable jury to infer that HSA Schilling knew that Mr. Hawkins could not or would not access Tylenol, which is an over-the-counter medication. In addition, there is no evidence that HSA Schilling knew that Mr. Hawkins's pain was so severe that denying him Tylenol or failing to immediately refer him to a medical provider exposed him to an excessive risk of harm. *See Thomas v. Clay*, 411 F. App'x 908, 910 (7th Cir. 2011) (defendants did not unnecessarily prolong plaintiff's pain from a shoulder injury where no evidence suggested that they were aware that his pain was so severe that denying him Tylenol or access to doctors who could refill his prescription pain medications posed an excessive risk of harm).

evidence would not permit a reasonable jury to infer that HSA Schilling knew that failing to provide Mr. Hawkins with immediate medical attention presented a serious risk to Mr. Hawkins's health, especially given that he was scheduled to see a medical provider the day after she responded to the request for interview form.[4]

Mr. Hawkins argues that material issues of fact preclude summary judgment because, per IDOC policy, medical staff should have reviewed his health care requests, scheduled him to be triaged within 24 hours, and ensured that he was seen by a provider within seven days. Dkt. 92 at 3. In addition, he contends that the IDOC's pandemic response manual required HSAs to arrange for immediate evaluation and treatment of any inmate with COVID-19 symptoms. *Id.* at 3–4. Thus, he argues, because policies were violated in his case, HSA Schilling was deliberately indifferent to his serious medical needs.[5]

That argument is unavailing. "Section 1983 protects against constitutional violations, not violations of departmental regulation and practices." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (cleaned up). The question is whether HSA Schilling knew that failing to get Mr. Hawkins immediate medical attention exposed him to a serious risk of harm, and Mr. Hawkins has designated no admissible evidence from which a jury could infer that she did. In his response brief, he suggests that a review of his medical records would have revealed that he had been diagnosed with sinus tachycardia, which increased his chances of dying from COVID-19. Dkt. 92

---

[4] The conclusion is the same even if the Court assumes that a jury could find that HSA Schilling received the request for interview form on September 30.

[5] Mr. Hawkins devotes considerable space in his response brief to arguing that HSA Schilling perjured herself in her summary judgment affidavit because she claimed that, so long as an inmate's medical need was not urgent, policy allowed medical staff to decline to set a new appointment for an inmate if they knew that he already had another appointment scheduled. *See generally* dkt. 92. He also spends considerable time arguing about whether COVID-19 tests were provided on demand in September 2020 and, if not, whether HSA Schilling was personally responsible for that policy. *Id.* Mr. Hawkins's allegations of perjury are baseless. Moreover, any disputes about the scheduling issue or the COVID-19 test issue are immaterial.

at 7. But no designated evidence suggests that HSA Schilling had reviewed his medical records or otherwise knew that he suffered from that condition. And her failure to do so at best would establish negligence, which is insufficient to show deliberate indifference. *Dean*, 18 F.4th at 241.

### 2. Causation

HSA Schilling is also entitled to summary judgment because, as she argues, Mr. Hawkins has not designated any evidence from which a reasonable jury could conclude that any delay in receiving care attributable to her caused an actionable injury. To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain. *Petties v. Carter*, 836 F.3d 722, 730–31 (7th Cir. 2016), *as amended* (Aug. 25, 2016). Where a plaintiff offers sufficient evidence from which a reasonable jury could infer delayed treatment him, summary judgment on the issue of causation is rarely appropriate. *Stockton v. Milwaukee Cty.*, 44 F.4th 6045, 615 (7th Cir. 2022). Summary judgment on causation is nonetheless warranted where "a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury." *Id.* (cleaned up).

In this case, Mr. Hawkins has not designated any evidence from which a reasonable jury could infer that the delay between HSA Schilling learning about Mr. Hawkins's COVID-19-like symptoms—at most, about a week, from September 30 to October 6, and possibly only one day, from October 5 to October 6—exacerbated his injury or unnecessarily prolonged his pain. The Court understands that, at the time, Mr. Hawkins was worried that his sinus tachycardia could put him at a greater risk for dying of COVID-19 and wanted to have his vitals checked to ensure that he was not in significant danger. Ideally, his first health care request form would have been promptly received and responded to, and he would have been evaluated sooner. It is unfortunate

11

that that did not happen, but no designated evidence suggests that the delay made Mr. Hawkins's case of COVID-19 worse than it otherwise would have been, caused long-lasting effects (such as damage to his heart), or unnecessarily prolonged his pain. The designated record evidence shows that, as it happened, Mr. Hawkins's case of COVID-19 did not cause serious symptoms that required significant medical interventions—like hospitalization, oxygen, or intravenous fluids. The Court does not doubt that Mr. Hawkins was uncomfortable, but there is no record evidence suggesting that anyone could have done more for Mr. Hawkins than give him fluids or Tylenol—both of which he could have obtained on his own. If Mr. Hawkins had not had access to adequate fluids or Tylenol on the commissary, the result might have been different, but he did. The Court understands that Mr. Hawkins chose not to try to buy Tylenol, but that choice does not mean that any pain he suffered after he submitted his request for interview form to HSA Schilling was unnecessary.

### 3. Summary

As explained, based on the designated evidence, no reasonable jury could conclude that HSA Schilling's alleged delay in obtaining medical care for Mr. Hawkins amounted to deliberate difference or that her actions exacerbated his injury or unnecessarily prolonged his pain. Accordingly, HSA Schilling's motion for summary judgment, dkt. [80], is **granted**.

### B. Lieutenant Storms

Mr. Hawkins contends that Lieutenant Storms was deliberately indifferent to his health and safety when he refused to move Mr. Hawkins to another range after Mr. Hawkins complained that he was being exposed to COVID-19-positive inmates.[6] Under the Eighth Amendment, "prisoners

---

[6] In his response, Mr. Hawkins also argues that Lieutenant Storms was deliberately indifferent because he failed to refer Mr. Hawkins to the medical department after Mr. Hawkins began exhibiting symptoms of COVID-19. Dkt. 94 at 10–11. But Mr. Hawkins's amended complaint includes no such allegations, nor did the Court allow him to proceed with such claims at screening. Dkts. 23, 24. Mr. Hawkins

cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

On that point, it is not enough for a plaintiff to show that he was exposed to a risk or even that the defendant knew about the risk. Instead, "prison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Put another way, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Id.*

---

cannot amend his complaint in his summary-judgment response brief. *See Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012). Regardless, the claims would fail. Mr. Hawkins rests this claim on his allegation that IDOC policy required Lieutenant Storms to refer him to the medical department. He does not even claim that he asked Lieutenant Storms to get him medical attention. But, as explained, merely violating an IDOC policy does not amount to a constitutional violation. And Mr. Hawkins fails to explain why his case of COVID-19 was so serious that Lieutenant Storms should have realized—without being asked—that he needed medical attention.

Lieutenant Storms contends that he was not deliberately indifferent to Mr. Hawkins's health and safety because he followed New Castle and CDC guidelines by putting inmates in their own cells and implementing the necessary sanitary procedures, meaning that there was no need to move Mr. Hawkins. Dkt. 86 at 3. He also argues that Mr. Hawkins's argument that a cell transfer would have prevented him from contracting COVID-19 is based on impermissible speculation. *Id.* at 7.

The Court agrees. Based on the designated evidence, no reasonable jury could conclude that Lieutenant Storms's decision to leave Mr. Hawkins in his single-man cell in the RHU was unreasonable, even if he knew that he was leaving Mr. Hawkins in close proximity to other inmates with COVID-19 and those inmates could give the virus to Mr. Hawkins. The Court appreciates that Mr. Hawkins feared contracting the virus from the inmates housed around him. And the Court will assume that a jury could find that he did catch the virus from those inmates, meaning that his fear materialized and that even being in a single-man cell proved insufficient to protect him from illness. But the fact is that Mr. Hawkins was already housed in a range that afforded more protection from COVID-19 than other housing arrangements typical in prisons and jails, such as dormitory housing or multi-man cells. Mr. Hawkins's claim is that Lieutenant Storms should have moved him to another range, so he needs to show that Lieutenant Storms could have moved him, knew that moving him would lessen his COVID-19 risk, and still refused to do so. The designated evidence does not permit such an inference. While it is undisputed for summary judgment purposes that Lieutenant Storms had the power to move Mr. Hawkins, there is no evidence that—at the relevant times—an appropriate alternative cell existed for Mr. Hawkins, let alone that Mr. Hawkins would have faced a significantly lower COVID-19 risk if moved to that cell.

Most of Mr. Hawkins's response is devoted to identifying disputes of fact that are not material. For example, he disputes that he and other inmates were housed in isolation or

segregation based on the fact that the doors of the cells, showers, and recreation rooms permitted air—and thus, the COVID-19 virus—to circulate. And he disputes that Lieutenant Storms was following the applicable COVID-19 policies, noting, for example, that the IDOC COVID policy required for separation and social distancing of ill inmates, but he was less than six feet from COVID-19-positive inmates and not really separated from them because of the openings on the cell doors. But, as explained, violations of IDOC policies are not necessarily constitutional violations. And the factual disputes he identifies do not change the fact that he has not designated any evidence allowing a reasonable jury to infer that Lieutenant Storms could have moved him to an appropriate cell that would have reduced his risk of exposure to COVID-19. *See, e.g.*, *Peate*, 294 F.3d at 884 (defendant would not be deliberately indifferent if his course of action was the only available course or a reasonable one).

Mr. Hawkins also complains about Lieutenant Storms's responses to his requests for admission and failure to produce certain information in discovery. *See, e.g.*, dkt. 94 at 12–13. But Mr. Hawkins never filed any motions to compel, and the time for raising discovery disputes has passed. Dkt. 52 at 6–7 (motions to compel must be filed within 60 days of receipt of inadequate response or deadline to respond). To the extent that he is complaining about responses to document requests that he received shortly before he filed his response brief, *see id.* at 13, none of the documents or evidence he requested would have shown that there was an alternative appropriate cell available for Mr. Hawkins that would have lessened his risk of contracting COVID-19, *see* dkt. 93-1 at 76–77.[7]

---

[7] Mr. Hawkins also accuses Lieutenant Storms of perjury, *see generally* dkt. 94, but those allegations are baseless. As to the specific allegation that Lieutenant Storms perjured himself because he denied a request for admission asking him to admit that he never moved Mr. Hawkins "away from the positive tested COVID-19 coronavirus offenders," *see* dkt. 85-2 at 6, the Court observes that the phrase "moved away" is ambiguous. While Mr. Hawkins might have meant to ask Lieutenant Storms to admit that

Accordingly, Lieutenant Storms's motion for summary judgment, dkt. [84], is **granted**.

## IV.
## Conclusion

For the reasons stated above, Defendants' motions for summary judgment, dkts. [80] and [84], are **granted**. His claims are dismissed **with prejudice.** Final judgment shall issue by separate entry.

The **clerk is directed** to update the docket to reflect that the full name of the defendant identified as "R. Schilling" is "Rachel Schilling."

**IT IS SO ORDERED.**

Date: 2/15/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

RAYMOND HAWKINS
885871
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Joseph Thomas Lipps
BBFCS ATTORNEYS
jlipps@bbfcslaw.com

---

he never moved Mr. Hawkins to another cell, but "moved away" could also fairly be read to refer to being placed in a single-man cell.